James A. **LEE**, Plaintiff,

v.

The **UNITED STATES**, Defendant.

No. 93–434C.

United States Court of Federal Claims.

Jan. 5, 1995.

Mary E. Baluss, Washington, DC, for plaintiff.

John S. Groat, Washington, DC, with whom was Asst. Atty. Gen. Frank W. Hunger, David M. Cohen, Director, for defendant. Lt. Col. Conrad Von Wald, and Lt. Col. David Yastishock, U.S. Air Force, of counsel.

## *OPINION*

ROBINSON, Judge:

This matter is before the court on defendant's motion to dismiss or, in the alternative, for summary judgment and plaintiff's cross-motion for summary judgment.

Plaintiff, Mr. James A. Lee, a commissioned officer in the United States Air Force Reserve ("USAFR" or "Air Force"), was honorably discharged based on substandard performance of duty. Mr. Lee contends that his discharge was unlawful and seeks back pay and reinstatement. Defendant argues that this court cannot hear this claim because this issue is nonjusticiable since the military has discretion in deciding whether to discharge a reserve officer.

Oral argument was held after the issues were fully briefed. For the reasons that follow, the court grants defendant's motion.

### *Background*

Plaintiff was commissioned as a second lieutenant in the USAFR on May 12, 1989, after completing a four-year Air Force Reserve Officer Training Corps (ROTC) program at the University of Arizona. On November 5, 1989, plaintiff reported, as ordered, to the 868th Student Squadron Davis Monthan Air Force Base (Davis AFB), Arizona, to attend a twelve-week Ground Launch Cruise Missile (GLCM) initial qualification training course. After completion of this course plaintiff was to be certified as a launch control officer for the GLCM system, an intermediate range nuclear missile system.

To ensure the reliability of those persons working with nuclear weapons, the Air Force has implemented a program, the Personnel Reliability Program (PRP), to screen members assigned to nuclear duty. Air Force Regulation (AFR) 35–99. The stated purpose of the PRP is designed "to make sure that each person who performs duties with nuclear weapons or weapons systems, or critical components, meets the highest standards of individual reliability." AFR 35–99, ¶ 1–1.

Under the PRP, a launch control officer is a "critical" position. AFR 35–99, ¶ 3–5. All members in training for a critical position must be certified under the PRP. PRP certification includes assignment to PRP duties, a background investigation, a security clearance and a physical examination. After the security clearance is obtained, a designated certifying official interviews the member and either grants certification or initiates decertification procedures. AFR 35–99, ¶ 4–3, Fig. 4–2.

As part of the PRP, individuals are required to monitor their own reliability and report anything which might adversely impact their performance.[1] On December 1, 1989, pursuant to AFR 35–99, Mr. Lee advised Capt. David M. Owen, Missile Procedures Instructor, that he had moral reservations regarding the use of nuclear weapons and he was unsure whether he could execute a valid launch order. Capt. Owen suggested that plaintiff discuss his concerns with other instructors and talk to him again the next week. When plaintiff again spoke with Capt. Owen, he was warned that the Air Force often discharges officers who express moral compunctions about the use of nuclear weapons.

Following Capt. Owen's suggestion, plaintiff spoke with Capt. Tommy L. James, Chief Operations Academics Training, about his moral concerns on December 7, 1989. Plain-

---

1. AFR 35–99 provides:

   1–10. *Individual's and Supervisor's Responsibilities.* Individuals assigned to PRP duties have the responsibility to monitor their own reliability from a safety standpoint. They should be aware of how certain problems, concerns, and circumstances may reduce their effectiveness—and may even impair their perfor-

   mance—to the point where a safety hazard exists. Individuals must advise supervisors of all factors (including medical or dental care) that could have an adverse impact on their performance and safety. Failure to discharge this responsibility may cast doubt on the individual's reliability and continued performance in PRP duties....

tiff told Capt. James he was unsure whether he could launch nuclear weapons. In response, Capt. James instructed plaintiff to decide whether he could launch nuclear weapons before his training went any further.

On December 8, 1989, plaintiff then spoke with his commander, Maj. Ray A. Glenboski, regarding his moral reservations about launching nuclear weapons, and stated that he did not know whether he could execute an order to launch a nuclear weapon. Maj. Glenboski informed plaintiff that "his primary job in the Air Force is as a launch control officer and if he can't perform this duty he faces a possible AFR 36–2 discharge." AR [2] 42. On December 11, 1989, plaintiff informed Maj. Glenboski that he could not work with nuclear weapons because his moral compunctions were strong enough that they could seriously hinder his ability to complete a launch order. Plaintiff prepared a written statement explaining his reasons for withdrawing from nuclear training. On December 19, 1989, the Air Force disenrolled plaintiff from his training class based on his statements that he could not support the GLCM mission.

After his disenrollment, plaintiff was assigned to non-nuclear duty at Davis AFB where he performed various clerical duties and was told to consider other positions within the Air Force. Mr. Lee was again reminded that he might be discharged. On December 20, 1989, plaintiff was assigned to the 836th Air Division Public Affairs. During his time in public affairs, plaintiff consistently received positive feedback from his superiors including a letter of appreciation for work relating to a base closing.

On April 4, 1990, Mr. Lee's wing commander, Col. Robert D. Livingston, recommended to the 836th Air Division Commander, Brig. Gen. Thomas R. Griffith, that a discharge action be initiated against Mr. Lee under AFR 36–2, ¶¶ 2–3(a) and 2–3(c), due to

"substandard duty performance." In support of his recommendation, Col. Livingston cited the occasions on which plaintiff discussed his inability to perform the duties of a launch crew member. On April 11, 1990, plaintiff received notification from Gen. Griffith of discharge proceedings initiated against him. Gen. Griffith advised plaintiff that the worst type of discharge he could receive was an honorable discharge, and that AFR 36–2, particularly ¶¶ 4–10 and 4–13, respectively outlined his rights and explained the actions the commander could take upon receipt of a reply from plaintiff.

Gen. Griffith forwarded his recommendation to Gen. Paul E. Stein, Commander of the Tactical Air Command (TAC). On April 22, 1990, plaintiff, through counsel, sent a letter to TAC headquarters addressing the dismissal action. In the letter, plaintiff argued that an action under AFR 36–2 was prohibited because his disclosure of his moral concerns was required by AFR 35–99 and could not constitute substandard performance of duty. Plaintiff also included a request for reassignment and retraining and a copy of this court's decision in *Tilley v. United States*, 19 Cl.Ct. 33 (1989).

On April 23, 1990, plaintiff personally responded to the dismissal action. In his response, plaintiff expressed a great desire to serve his country and stressed how hard he had worked to attain his current position in the military. Plaintiff also stated that he and the other trainees were ordered by their instructors to express any moral reservations they were having against the use of nuclear weapons, and were told that such feelings were normal and that they would not be subject to punitive action for revealing such reservations.

On May 23, 1990, Gen. Stein recommended plaintiff be honorably discharged and put forth the reasons in a "Statement of Reasons." [3] In the Statement of Reasons, Gen.

---

**2.** AR refers to the Administrative Record filed with defendant's motion.

**3.** According to the Statement of Reasons:
The duty performance of Lieutenant James A. Lee ... has fallen below the standards prescribed for an officer of his grade and experi-

ence as evidenced by his failure to show acceptable qualities of leadership required of an officer of his grade, and failure to properly discharge duties equal to his grade and experience. His general poor officership and leadership qualities are evidenced by his efforts to

Stein cited the occasions on which plaintiff stated he was unsure he could perform duties as a launch crew member.

On June 25, 1990, the Air Force Personnel Board recommended that plaintiff "be honorably discharged from his appointment as a Reserve officer pursuant to Air Force Regulation 36–12, paragraph 3–14...." AR 6. On July 16, 1990, plaintiff's appointment as a Reserve officer was terminated and plaintiff was honorably discharged on July 30, 1990, for substandard performance of duty.

On July 12, 1993, plaintiff commenced the present action contending that he was discharged in violation of Air Force regulations and the United States Constitution. Plaintiff seeks reinstatement, back pay, allowances and correction of his military records. Defendant then moved that the court dismiss plaintiff's complaint under RCFC 12(b)(4) for failure to state a claim upon which relief can be granted or, alternatively, to grant it summary judgment. Plaintiff opposed defendant's motion to dismiss and cross-moved for summary judgment.

### Contentions of the Parties

Plaintiff contends that his discharge from the Air Force violated existing regulations. According to plaintiff, his dismissal for substandard performance of duty was based on his statements that he had moral reservations concerning the use of nuclear weapons. Plaintiff argues he was required to make these statements under AFR 35–99, ¶ 1–10, and they cannot, therefore, constitute substandard performance of duty. Further-

more, plaintiff argues that this same regulation at ¶¶ 5–1(b) and 5–7(a)(1) prohibit the Air Force from dismissing him based on these disclosures. In addition, says plaintiff, this regulation provides for reassignment and retraining, and he could have ably served in any non-nuclear capacity.

Plaintiff also argues that his discharge violated his rights under the First and Fifth Amendments of the United States Constitution. Plaintiff contends that his discharge is stigmatizing in that his discharge form accuses him of substandard performance of duty, and because of the stigmatizing nature of the action, he was entitled under the Fifth Amendment to a hearing before he was discharged. Finally, plaintiff contends that his discharge based on speech alone—his expression of moral reservations concerning his use of nuclear weapons—violated his rights under the First Amendment.

Defendant counters that the Air Force could properly determine that plaintiff's expressed moral reservations constitute substandard performance of duty under AFR 36–2. According to defendant, the court should defer to an agency's interpretation of its own regulations, and that under the Air Force's interpretation AFR 35–99 does not prohibit it from dismissing those who express their inability to launch nuclear weapons due to moral reservations. Moreover, defendant contends that the question of whether plaintiff's conduct constitutes substandard conduct is a nonjusticiable issue committed to the

---

limit the scope of his assigned duties and unwillingness to complete training. Specifically:

a. On or about 1 December 1989 he stated to Captain David M. Owen, 868 TMTS Missile Procedures Trainer Instructor, that he was unsure that he could perform duties as a launch crew member.

b. On or about 7 December 1989 he stated to Captain David M. Owen that he was unsure that he could perform duties as a launch crew member.

c. On or about 7 December 1989 he stated to Captain Tommy L. James, 868 TMTS Missile Chief of Operations Academics Training, that he was unsure he could perform duties as a launch crew member.

d. On or about 8 December 1989 he stated to Major Ray A. Glenboski, Commander, 868 Student Squadron, that he did not know if

he could perform his duties as a launch control officer.

e. On or about 11 December 1989 he stated to Major Ray A. Glenboski, that he had made a decision that he could not work with nuclear weapons.

f. On or about 11 December 1989 he made a written statement that he was voluntarily withdrawing from AFSC 1821 because he could not uphold the mission of Launch Control Officer due to moral compunctions.

g. He was evaluated by Captain Alvin Jones, Clinical Psychologist, Dr. (Maj) Louis A. Barton, Chief Mental Health Services, on 12 December 1989. No mental illness or related problems were detected that may have affected his stated refusal to perform missile launch duties.

AR 13.

discretion of the military; judicial review, therefore, is not available.

As to plaintiff's constitutional claims, defendant asserts that plaintiff has no constitutionally protected liberty interest implicated by his separation which might be reviewable by this court and that the First Amendment does not protect plaintiff's expression of moral reservations about his own use of nuclear weapons. Alternatively, defendant argues that plaintiff waived any consideration of his Due Process and First Amendment claims by failing to raise them during the administrative process.

### DISCUSSION

Under the rules of this court, when considering a motion to dismiss for failure to state a claim upon which relief can be granted, the factual allegations in the complaint are taken as true and all reasonable inferences are drawn in favor of the plaintiff. RCFC 12(b)(4); *Papasan v. Allain,* 478 U.S. 265, 283, 106 S.Ct. 2932, 2943, 92 L.Ed.2d 209 (1986); *Marshall v. United States,* 21 Cl.Ct. 497, 499 (1990). The standard for dismissal mandates that the court may not dismiss a complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957), *quoted in Kinne v. United States,* 21 Cl.Ct. 104, 107 (1990).

Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. RCFC 56(c). Only disputes over material facts, facts that affect the outcome of the suit, preclude an entry of judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

1. *Justiciability.*

The court's jurisdiction over plaintiff's claim that the Air Force violated existing regulations is not in issue. Jurisdiction is based on plaintiff's claim that he was removed from the Reserves through an illegal action of the military. Mr. Lee was an Air Force Reserve Officer on active duty and under 37 U.S.C. § 204(a)(1) (1988), he was entitled to pay and allowances until legally removed. *See United States v. Testan,* 424 U.S. 392, 407, 96 S.Ct. 948, 957–58, 47 L.Ed.2d 114 (1976); *see also Sawyer v. United States,* 930 F.2d 1577, 1580 (Fed.Cir.1991). Plaintiff's claim that he was unlawfully removed from a status for which a statute mandated payment of money by the government has long been held to be within this court's jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a)(1). *See Voge v. United States,* 844 F.2d 776, 779 (Fed.Cir.1988); *Sargisson v. United States,* 913 F.2d 918, 920 (Fed.Cir.1990); *Sawyer,* 930 F.2d at 1577.

The issue in this case, rather, is whether the court has power to review the Air Force's decision to release Mr. Lee. In other words, the question is whether the subject matter of this suit is appropriate for judicial review such that this court may hear the suit. *See Baker v. Carr,* 369 U.S. 186, 198, 82 S.Ct. 691, 699–700, 7 L.Ed.2d 663 (1962). Defendant asserts that the Air Force's decision to release Mr. Lee is beyond the competency of the court; it is a nonjusticiable issue since the decision of who may serve in the military should be the military's alone.

Justiciability relates to whether a federal court may hear and decide a case; it involves prudential and constitutional concerns such that in some instances policy or deference to other branches of the government dictates against judicial review. Erwin Chemerinsky, *Federal Jurisdiction* at 38 (1989). For instance, a nonjusticiable political question may arise as a result of the separation of powers. *Baker,* 369 U.S. at 210, 82 S.Ct. at 706. There are certain areas committed to other branches of the government into which the courts should not intrude. *Flast v. Cohen,* 392 U.S. 83, 95, 88 S.Ct. 1942, 1950, 20 L.Ed.2d 947 (1968). Under Article II of the United States Constitution, the President is established as the Commander in Chief of the Armed Forces; thus, with regard to the power of the Executive branch in the military arena, the courts have recognized the need to give the decisions of the military a great deal of deference. As a result, the courts have been "reluctant to

intrude upon the authority of the Executive in military and national security affairs." *Department of Navy v. Egan*, 484 U.S. 518, 530, 108 S.Ct. 818, 825, 98 L.Ed.2d 918 (1988). "The military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in judicial matters." *Orloff v. Willoughby*, 345 U.S. 83, 94, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953). However, deciding whether any matter has been committed to another branch of the government must be made on a case by case basis and is a "delicate exercise in constitutional interpretation," *Baker*, 369 U.S. at 211, 82 S.Ct. at 706, that this court does not take lightly.

■ The Supreme Court in *Baker v. Carr* articulated factors to consider when determining whether an issue is a nonjusticiable political question. These factors include:

[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or

[2] a lack of judicially discoverable and manageable standards for resolving it; or

[3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or

[4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or

[5] an unusual need for unquestioning adherence to a political decision already made; or

[6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. at 217, 82 S.Ct. at 710. "Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence." *Id.*

■ The United States Court of Appeals for the Federal Circuit has adopted the test for justiciability set forth by the U.S. Court of Appeals for the District of Columbia in *Greene v. McElroy*, 254 F.2d 944 (D.C.Cir. 1958), *rev'd on other grounds*, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959), namely, for judicial review to be appropriate, there must be "tests and standards" the court can administer to determine whether the military's actions were correct. *Voge*, 844 F.2d at 780; *Sargisson*, 913 F.2d at 922; *see also Murphy v. United States*, 993 F.2d 871, 873 (Fed.Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1402, 128 L.Ed.2d 75 (1994). Although *Greene* was decided prior to *Baker v. Carr*, this test is not inconsistent with one of the factors set forth in *Baker*, that an issue is nonjusticiable if there are no judicially discoverable and manageable standards for resolving it. Moreover, this court is bound to follow the test set forth by the Federal Circuit.

■ Under 10 U.S.C. § 681(a) (1988), the Secretary of the Air Force has discretion to release Reserve members at will.[4] *Sargisson*, 913 F.2d at 921. However, when the military's discretion has been limited, such as by statute or regulation, it is bound to adhere to those statutes or regulations, *Finkelstein v. United States*, 29 Fed.Cl. 611, 616 (1993), and the courts can be called upon to ensure compliance if there are "tests and standards" by which the court can measure the military's conduct. *See Murphy*, 993 F.2d at 873; *Voge*, 844 F.2d at 779.

■ Determining whether the Air Force followed the correct procedures in discharging plaintiff is clearly within the competency of the court. *Murphy*, 993 F.2d at 873. Regulations dictating that certain procedures be used inherently contain "tests and standards" by which this court may measure the military's action. *Id.*

A court may appropriately decide whether the military followed procedures because by their nature the procedures limit the military's discretion. The court is not called upon to exercise any discretion reserved for the military, it merely deter-

---

4. 10 U.S.C. § 681(a) provides: "Except as otherwise provided in this title, the Secretary concerned may at any time release a Reserve under his jurisdiction from active duty."

mines whether the procedures were followed by applying the facts to the statutory or regulatory standard.
*Id.* Mr. Lee asserts no procedural violations [5] other than his Due Process claim, but instead asks that the court look at the substantive basis for the Air Force's decision to release him, namely, that his revelation of moral reservations regarding his ability to launch nuclear weapons constitutes substandard performance of duty. However, when it comes to reviewing the substantive basis for the Air Force's decision to release Mr. Lee, there are not necessarily any inherent tests and standards. *Murphy*, 993 F.2d at 873. Thus, the court must determine whether any statute or regulation provides tests and standards by which this court can measure the Air Force's conduct. *Id.*

■ Plaintiff points to AFR 35–99 as providing regulatory strictures the court can

apply. Plaintiff asserts, and defendant does not dispute, that plaintiff was required to reveal his moral reservations regarding nuclear weapons in order to comply with AFR 35–99, ¶ 1–10.[6] Plaintiff also contends, however, that the same regulation, at ¶¶ 5–1(b) [7] and 5–7(a)(1) [8], prohibits the Air Force from dismissing him for complying with AFR 35–99. While plaintiff admits that he could not have been certified under the PRP program due to his revelation of moral reservation, he says that AFR 35–99, ¶¶ 5–1(b) and 5–7(a)(1), state that denial of certification is not punitive and that punitive action will not be taken solely because of a failure to be certified. According to plaintiff, his discharge is a punitive action taken solely because of his failure to be certified or remain certified, under the program in contravention of AFR 35–99, and is, thus, illegal.

Defendant contends that the Air Force's actions were not illegal. Defendant argues

---

5. The court, *sua sponte,* raised the question of whether plaintiff could assert the denial of procedural rights under AFR 35–99. It appeared to the court upon a preliminary review of AFR 35–99 that any member assigned to PRP duties or in training for PRP duties is required to be either certified or decertification procedures should be initiated. According to AFR 35–99, ¶ 5–1, entitled "Removing a Member From PRP Duty," at sub-paragraph (c) "members may be removed from PRP duties in one of three ways: by suspension, by temporary decertification, and by permanent decertification." All three options ultimately lead to decertification.

The procedures for certifying a member are outlined in figure 4–2 of AFR 35–99 which states that the certifying official, "[i]f the individual is *not certified* or recertified, initiates disposition action according to chapter 5." (Emphasis added.) Disposition according to Chapter 5 is decertification.

Finally, under ¶ 6–2(a)(1) of Chapter 6, entitled "Screening Students Attending Formal Training Courses," "[i]ndividuals who fail to maintain PRP standards throughout the training period *must* be *permanently decertified* and reclassified or separated as appropriate." (Emphasis added.) In this regard, it is interesting to note that defendant admits, "the Air Force could not have permanently removed Mr. Lee from missile training based upon his revelation of his moral compunction without first complying with the procedures in chapter 5 for permanent decertification absent Mr. Lee's voluntary withdrawal from training." Def.Resp./Reply Br. at 14.

Mr. Lee, while training for PRP duties, was neither certified nor were any decertification procedures initiated. When questioned at oral argument as to whether Mr. Lee was denied

procedural rights under AFR 35–99, because decertification procedures were never initiated, counsel for both parties responded negatively. Plaintiff's counsel stated that Mr. Lee was *not* arguing that he should have been decertified or that any other procedural infirmity occurred in relation to his removal from training. Specifically, plaintiff's counsel stated that she did not see any need for Mr. Lee to be formally decertified because Mr. Lee disqualified himself from missile training. R. at 42–43. The court accepts these statements as a disavowal and waiver of any claims to procedural defects (excepting plaintiff's Due Process claim). The court's questions regarding Mr. Lee's procedural rights were clear and plaintiff's waiver was equally plain. Plaintiff was given the opportunity to assert a claim based on improper procedure and declined. Accordingly, given plaintiff's clear and unequivocal waiver, the court makes no finding as to whether Mr. Lee was required to be decertified.

6. *See,* note 1, *supra.*

7. Paragraph 5–1(b) states "[d]enial or revocation of certification under this regulation is not punitive and does not in itself constitute grounds for disciplinary measures or judicial or nonjudicial punishment. However, such a denial or revocation is not a bar to any disciplinary or administrative measures that are otherwise appropriate." AFR 35–99.

8. Paragraph 5–7a(1) states "[p]unitive action is not to be taken against personnel solely because of their failure to qualify or to remain qualified under this program." AFR 35–99.

that the Air Force has discretion under AFR 35–99 to release Mr. Lee and that AFR 35–99 does not provide any tests and standards. After reviewing the applicable regulations and recent binding decisions of the Federal Circuit the court agrees with defendant that, under AFR 35–99, the Air Force has the discretion to release Mr. Lee.

Provisions of AFR 35–99 support defendant's contention that the Air Force has left itself with the discretion to discharge Mr. Lee. For instance, ¶ 5–1(b), relied on by the plaintiff to show that the Air Force's discharge was illegal, also states that denial of certification is *not* a bar to otherwise appropriate administrative procedures.[9] Thus, the first sentence in 5–1(b), "denial or revocation of certification under this regulation is not punitive," is not meant to shield members from other administrative action such as separation. Further, ¶ 5–7(a)(2) provides that the "cause for permanent decertification may also require other administrative or punitive action." AFR 35–99. Thus, AFR 35–99 contemplates that the cause for decertification may also be grounds for separation.

Plaintiff agrees that in some instances, the cause for decertification, *i.e.*, drug use, may also warrant separation. In addition, plaintiff states that if a member "frolicked all night and failed his tests" that might constitute substandard performance of duty which could warrant both decertification and separation. R. at 39. Yet, plaintiff argues that while a member may be decertified for having moral reservations regarding his ability to launch nuclear weapons, that member may not also be separated for that reason. However, AFR 35–99 does not provide any standards for the court to apply to determine what activity justifies only decertification as opposed to decertification and separation. The court cannot substitute its judgment in this instance.

More significantly, ¶ 5–7(a)(4) states "[m]embers permanently decertified because of substandard conduct . . . should be considered for separation under appropriate governing directives." AFR 35–99. Here the Air Force explicitly has ascribed to itself the discretion to release members due to sub-

standard conduct. Plaintiff responds that his revelation of moral compunction in compliance with ¶ 1–10 of AFR 35–99 cannot constitute substandard conduct. Plaintiff, however, has failed to point to any statutory or regulatory provision which provides the court with tests and standards to determine exactly what conduct constitutes substandard performance of duty. Substandard performance of duty is described in AFR 36–2, Chapter 2 and consists of such things as "[f]ailure to show acceptable qualities of leadership required of an officer of his or her grade," ¶ 2–3(a), "[f]ailure to properly discharge duties equal to his or her grade and experience, ¶ 2–3(c), and "inability to perform duties." ¶ 2–3(i). However, no language in this regulation provides sufficient tests and standards that would allow the court to measure what constitutes substandard performance of duty.

■ The general rule is that the determination of who is fit for military service is committed to the Executive branch. *Maier v. Orr*, 754 F.2d 973, 982 (Fed.Cir.1985). Absent clear tests and standards, substandard performance of duty is too ill defined in this instance not to be left to the discretion of the military. Thus, the court cannot say that even plaintiff's compelled revelations of his inability to follow a nuclear launch order due to moral reservations does not constitute substandard performance of duty of such a magnitude that the Air Force has surrendered its discretion to not only decertify but to discharge him.

That the Air Force has retained the discretion to release plaintiff is further evidenced by AFR 35–99, Chapter 6 entitled "Screening Students Attending Formal Training Course." Paragraph 6–2(b)(1) provides "[i]ndividuals who fail to maintain PRP standards throughout the training period must be permanently decertified and reclassified *or separated* as appropriate." AFR 35–99 (Emphasis added.) Thus, this section of AFR 35–99 also supports the conclusion that it was within the Air Force's discretion to reclassify or separate Mr. Lee.

**9.** *See,* note 6, *supra.*

As stated, the determination of who is fit for military service is left to the discretion of the military absent a limitation on that discretion. Plaintiff has failed to show any clear limitations on that discretion in the cited regulations. Plaintiff does not contend that he could not have been decertified for revealing his moral reservations. Rather, plaintiff contends he could not be discharged for that reason. However, the regulations, considered as a whole, contemplate that the cause for decertification, *i.e.*, revelation of moral compunction regarding the use of nuclear weapons, may be cause for separation. The military has not waived or limited its discretion in this regard. Accordingly, the court must agree with defendant that at least under the facts in this case, this issue is nonjusticiable.[10]

The plaintiff relies heavily on this court's decision in *Tilley*. In *Tilley*, the plaintiff, a member of the Air Force, had expressed concerns over the United States' nuclear weapons policy. He erroneously believed that the policy of the United States permitted an unprovoked preemptive strike. *Tilley*, 19 Cl.Ct. at 35. After learning that an unprovoked first strike would be contrary to the United States' policy, he stated he could follow a launch order. *Id.* Nonetheless, the Air Force permanently decertified the plaintiff from the PRP because of "unacceptable limitation[s] on his service." *Id.* In *Tilley* this court found that the plaintiff's statement

could not constitute substandard performance of duty. *Id.* at 41. While the court could attempt to factually distinguish *Tilley* from the present case,[11] it is clear that the court's holding today is inapposite to that in *Tilley*.

In *Tilley*, the court sought to preserve the integrity of the PRP program. As the court has noted, it recognized that if the military were allowed to dismiss members for revealing moral compunctions as required by the PRP, the program would be undermined and rendered meaningless. Members simply would not reveal moral compunctions and unreliable members would remain in nuclear positions. However, the court is now convinced the PRP regulations are not written in such a way that allows the court to attempt to preserve the program's integrity. AFR 35–99 contains provisions which when construed *in pari materia* with other related regulations leave the question of separating those members who reveal moral compunctions to the military. Since the military has retained discretion to make policy in this area, the court cannot overturn even questionable policy decisions.

Moreover, the court believes this decision is compelled by the Federal Circuit's decision in *Murphy*. In *Murphy*, the Federal Circuit stated explicitly that this court cannot exercise any discretion reserved for the military and that the release of Reserve officers is

10. The discharge of an otherwise qualified officer for substandard performance of duty, namely for his expression of moral compunctions, seems unduly harsh and in practical application, could be contradictory to the purpose of the PRP which is to ensure the absolute reliability of all members working with nuclear weapons. But the Air Force's uniform policy has been, and continues to be, that it will release all members who, once entering the training process, reveal moral reservations regarding nuclear weapons. The Air Force reasons that such training is voluntary and that an officer's refusal to carry out a lawful order destroys the reliance that the Air Force has in its officer corps to follow all orders without question. While the court appreciates the reasons behind this policy, the practical result is that members likely will not reveal their inability to launch nuclear weapons if they know they will be automatically and summarily discharged. Inherent in this policy, of course, is the risk that an indeterminate number of unreliable members in the nation's most sensitive security positions,

may not disclose their inability to launch nuclear weapons in order to remain in the service. However, this is the Air Force's policy and, based on binding Federal Circuit precedent, the court has no authority to change it.

11. For example, in *Tilley*, the court was reviewing a refusal to follow a finding by the Air Force Board for Correction of Military Records (Board) that Mr. Tilley's conduct could not constitute substandard performance of duty. In addition, the plaintiff in *Tilley* had been decertified, and, more importantly, had never stated that he could *not* obey a launch order. In contrast, Mr. Lee did not apply to the Board, so there is no Board finding that Mr. Lee's performance of duty was not substandard. Further, Mr. Lee was never decertified, and stated that he may not be able to follow a launch order under any circumstances. Additionally, some changes appear to have been made to the regulations between the time of *Tilley* and this case.

within the military's discretion. 993 F.2d at 873. Only where that discretion has been limited *and* Congress has established tests and standards is judicial review appropriate. *Id.* From the court's reading of all applicable regulations, it cannot find that the Air Force meant to limit its discretion *and* provide tests and standards against which to measure its application of the program. Accordingly, the court finds that while it has jurisdiction, the issues presented are nonjusticiable. The decision in *Tilley* is, to some degree, inconsistent with the decision in *Murphy;* to that extent, it is overruled.

### 2. Constitutional Claims.

■ Defendant asserts that plaintiff has waived his right to assert his constitutional claims because he failed to raise them during the administrative process. However, defendant fails to consider that Mr. Lee was not required to exhaust his administrative remedies before filing suit in this court. *Heisig v. United States,* 719 F.2d 1153, 1155 (Fed.Cir. 1983). Since this court cannot require plaintiff to proceed through the administrative process, it also cannot impose a requirement that plaintiff first raise constitutional claims during the administrative process. Mr. Lee, in challenging his discharge, could either seek relief in this court or go before the Air Force Board for the Correction of Military Records. Having chosen to come to this court, plaintiff had no forum within which to present his constitutional claims. The court, thus, finds that plaintiff has not waived his right to present his constitutional claims by not first seeking relief from the Board.

### A. First Amendment Claim.

■ While this court has jurisdiction over a claim for money founded upon the Constitution,[12] the First Amendment, "standing alone," has not been interpreted to mandate the payment of money so as to support this court's jurisdiction. *Hamlet v. United States,* 873 F.2d 1414, 1416 (Fed.Cir.1989).

However, a claim for back pay based on wrongful discharge in response to an exercise of First Amendment rights is within this court's jurisdiction. *See United States v. Connolly,* 716 F.2d 882, 887 (Fed.Cir.1983); *Hamlet,* 873 F.2d at 1416 (finding a claim that civil servant's discharge violated First Amendment rights actionable in Court of Federal Claims); *see also Jackson v. United States,* 192 Ct.Cl. 765, 768, 428 F.2d 844, 846 (1970) (Court of Claims has jurisdiction over a claim for back pay alleging wrongful dismissal from government as a reprisal for exercising First Amendment rights.). Thus, plaintiff's claim that his dismissal was illegal because it violated his First Amendment right to free speech is not a claim based solely on the First Amendment and is within this court's jurisdiction. *Id.*

■ Plaintiff contends that the Air Force discharged him solely because he expressed moral concerns about the use of nuclear weapons and, thereby, violated his First Amendment rights. Determining whether a public employee's speech is protected by the First Amendment involves a two-step analysis. First, the court must determine whether the speech involves a matter of public, rather than private, concern. *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 1689–90, 75 L.Ed.2d 708 (1983). The second step involves a balancing of interests. The court must determine whether the employee's First Amendment interests outweigh the interest of the employer in promoting the efficiency of its services. *Id.* at 150, 103 S.Ct. at 1691–92; *see also Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734–35, 20 L.Ed.2d 811 (1968). In this case plaintiff fails at both stages of the analysis.

■ Whether plaintiff's speech addresses a matter of public concern is determined by the content, form and context in which the statement was made. *Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690. Plaintiff attempts to argue that because his state-

---

**12.** Jurisdiction is based on the Tucker Act which provides:

The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (1993).

ments concerned the use of nuclear arms they pertained to matters of public concern. According to plaintiff, the reliability of the United States' nuclear launch policy is a substantial public safety concern and the use to be made of nuclear arms cannot be dismissed as a matter of passing individual curiosity. However, Mr. Lee's speech did not address the reliability of the Air Force's nuclear launch policy or the propriety of using nuclear arms. Rather, plaintiff's speech addressed matters of private concern—his own inability to launch nuclear weapons because of moral reservations. Plaintiff mistakenly confuses a statement of public concern with a statement of private concern regarding a topic that may, in a different context, be of public interest. The distinction is not immaterial. Mr. Lee has not in any way questioned the nuclear weapons policy of the United States, expressed concern over the reliability of that policy, or challenged the use of nuclear weapons. Simply put, Mr. Lee merely expressed that he himself was unable to launch nuclear weapons. This quite plainly is a matter of plaintiff's own private concern. Plaintiff has not stated anything that is a matter of concern to the public. Indeed, public debate on the United States' nuclear weapons policy remains unfettered as a result of plaintiff's discharge.

█ Plaintiff also fails at the second stage of the analysis. In regards to national defense, the military has a compelling need to ensure that all members will carry out all lawful orders. This need outweighs any protection to which Mr. Lee's speech was entitled. "The military need not encourage debate or tolerate protest to the extent that such tolerance is required of the civilian state by the First Amendment; to accomplish its mission the military must foster instinctive obedience, unity, commitment, and esprit de corps." *Goldman v. Weinberger*, 475 U.S. 503, 507, 106 S.Ct. 1310, 1313, 89 L.Ed.2d 478 (1986). Thus, even if there was any interference with protected expression in this case, it was merely incidental to the military's need to ensure discipline in order to carry out its important mission. Accordingly, plaintiff's speech was not protected by the First Amendment, and his claim must fail.

**B.** *Fifth Amendment Due Process.*

Plaintiff contends that his liberty interest under the Fifth Amendment was violated by the Air Force's failure to hold an adversarial hearing prior to publishing a stigmatizing discharge form and that his discharge is, therefore, void. Defendant counters that this court is without jurisdiction to hear such a claim because the remedy for a violation of plaintiff's liberty interest is a name clearing hearing which this court lacks authority to grant.

Upon his discharge, Mr. Lee was provided with two copies of a "CERTIFICATE OF RELEASE OR DISCHARGE FROM ACTIVE DUTY," (DD Form 214), "copy 1" and "copy 4." In the upper portion of the form in the area where "primary specialty" is to be inserted, both copies 1 and 4 contain the statement "Officer Not Available For Use In Awarded AFSC For Cause." The bottom of copy 4, but not copy 1, in the section labeled "narrative reason for separation," additionally contains the statement "Invol[untary] Discharge: Substandard Performance of Duty." Both copies of DD Form 214 identify plaintiff's character of service as honorable.

Plaintiff originally contended only that copy 4 reciting that he was discharged for substandard performance of duty was stigmatizing. Plaintiff now contends that both copy 1 and copy 4 contain stigmatizing material. According to plaintiff, the information contained on copies 1 and 4 presents a "derogatory connotation to the public at large," and as a result his liberty interests were violated when this stigmatizing publication took place without an adversarial hearing. To support this position, plaintiff cites to the decisions in *Casey v. United States*, 8 Cl.Ct. 234 (1985), and *Rogers v. United States*, 24 Cl.Ct. 676 (1991), *aff'd without op.*, 996 F.2d 317 (Fed.Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 225, 126 L.Ed.2d 180 (1993).

Both *Casey* and *Rogers* involved servicemen discharged for drug and alcohol abuse. In both instances the discharge form contained a code which identified the cause of the discharge as drug and alcohol abuse, and in both cases the court found the servicemen's discharge stigmatizing and ordered

back pay. *Casey*, 8 Cl.Ct. at 242–43; *Rogers*, 24 Cl.Ct. at 691. These decisions were based in part on a decision by this Court's predecessor, the United States Court of Claims, in *Keef v. United States*, 185 Ct.Cl. 454, 1968 WL 9154 (1968).

In *Keef*, the Court of Claims considered a former Air Force sergeant's suit for back pay and reinstatement after being honorably discharged for the convenience of the government based on "unique and unusual circumstances." The plaintiff in *Keef*, allegedly involved in homosexual conduct, argued that his constitutional rights were violated by the Air Force's *ex parte* proceeding and that the reference to "unique and unusual circumstances" and a designation which precluded reenlistment were stigmatizing. The court in *Keef* stated "[a]s a general rule, if the regulation pursuant to which a servicemen is honorably discharged does not, by its own terms, require notice and a hearing, they are required only if the discharge, albeit honorable, either casts a stigma on the servicemen or has some derogatory connotation." *Keef*, 185 Ct.Cl. at 467. The court continues that it would "not permit the imposition of a stigma 'without respect for even the most elementary notions of due process of law....'" *Id.* at 467–68 (quoting *Clackum v. United States*, 148 Ct.Cl. 404, 407, 296 F.2d 226, 228 (1960)). The court proceeded to rule for the government finding that the reference "unique and unusual circumstances" was not stigmatizing but rather a "nondescript 'catchall' reason for separation," and that plaintiff had failed to show that the designation which precluded reenlistment was stigmatizing since it was not necessarily a mark of discredit or disgrace. *Id.* at 468–69; *see also Vierrether v. United States*, 27 Fed.Cl. 357, 365 (1992), *aff'd without op.* 6 F.3d 786 (Fed.Cir.1993) (following *Keef* the court finds a code on a discharge form barring reenlistment not stigmatizing).

Defendant, to support its position that this court lacks jurisdiction over this matter, also cites to a decision by the Court of Claims, *Fiorentino v. United States*, 221 Ct.Cl. 545, 607 F.2d 963 (1979), *cert. denied*, 444 U.S. 1083, 100 S.Ct. 1039, 62 L.Ed.2d 768 (1980), decided subsequently to *Keef*. In *Fiorenti-*

*no*, the plaintiff, a former HUD attorney, challenged his dismissal from that position. One of the plaintiff's claims was that he had a liberty interest, by virtue of derogatory material in his file created in connection with his removal for cause, which was violated when he was dismissed without a hearing. The plaintiff sought back pay and reinstatement. The defendant in that case directly challenged the Court of Claims' jurisdiction to provide relief for a liberty interest violation. The defendant argued that the only relief the plaintiff was entitled to was a name clearing hearing and that the court could not grant such relief.

The court in *Fiorentino* agreed with the defendant. There the court, looking at the Constitution, stated "the Constitution requires only that a person with a liberty interest in plaintiff's position be given a chance to clear his name, not reinstatement or back pay which are intrinsically inappropriate." *Fiorentino*, 221 Ct.Cl. at 554, 607 F.2d at 969. In support, the court cited to the United States Supreme Court's decision in *Codd v. Velger*, 429 U.S. 624, 628, 97 S.Ct. 882, 884, 51 L.Ed.2d 92 (1977), and stated "that in a 'liberty' context the purpose of notice and hearing to a discharged employee not having a property interest is to give him an opportunity to clear his name and does not include reinstatement." *Fiorentino*, 221 Ct.Cl. at 554, 607 F.2d at 969. Following this reasoning, the Court of Claims held that:

> Congress does not at present maintain a statutory consent to suit in this court by a former employee, removable at will, who asserts a "liberty" interest only by reason of derogatory material in his government file created in connection with his removal, and who, as relief for that action, would be entitled only to elimination of that material, not reinstatement or back pay.

221 Ct.Cl. at 556, 607 F.2d at 970.

The Court of Claims in *Montalvo v. United States*, 231 Ct.Cl. 980, 983, 1982 WL 25825 (1982), confirmed its holding in *Fiorentino*. In that case, citing *Fiorentino*, the court said "[a]s to plaintiff's liberty interest in his employment, allegedly violated because of the stigmatizing nature of the accusations made against him, we have recently held that such

a claim is not within our jurisdiction." 231 Ct.Cl. at 983. At least two other cases have relied on *Fiorentino* in finding this court lacks jurisdiction. *See Walker v. United States*, 11 Cl.Ct. 77 (1986) (finding the court lacks jurisdiction to hear plaintiff's claim because violation of plaintiff's liberty interest only entitles plaintiff to a chance to clear his name and not to reinstatement and back pay); *see also Biagioli v. United States*, 2 Cl.Ct. 304, 309 (1983) (stating the Court of Claims in *Fiorentino* disclaimed jurisdiction).

After careful consideration of all precedents related to this issue, the court finds, on balance, that *Fiorentino* is more persuasive and, therefore, is dispositive on the issue of this court's jurisdiction. *Keef, Casey* and *Rogers* assume jurisdiction over a plaintiff's liberty interest claim but make no mention of *Fiorentino* and its progeny and this court's jurisdiction was never directly challenged in those cases. In contrast, the court in *Fiorentino*, squarely addressed this court's jurisdiction to hear a claim based on violation of a liberty interest and found it lacking.

The court acknowledges that the court in *Keef* was concerned that discharged servicemen be afforded constitutional protection. According to the court its "primary concern in these cases is to prevent the Armed Forces from imposing a penalty on a discharged servicemen without affording him

some basic constitutional protection...." *Keef*, 185 Ct.Cl. at 467. The court in *Fiorentino* was similarly concerned, as is this court, that discharged employees [13] be given basic constitutional protection. In *Fiorentino*, however, the court found that plaintiff had a remedy in an alternate forum. The court stated that:

> [if] the consent to be sued here ever included the back pay claim of one having no property interest in his job, and legally aggrieved solely because of derogatory material in government files generated by his firing, we think that consent is withdrawn by the Privacy Act of 1974, 5 U.S.C. § 552a. It provides an administrative remedy for one so aggrieved, and if he is unsuccessful with that, he can sue in the U.S. District Court, including a suit for correction of his record.

*Fiorentino*, 221 Ct.Cl. at 555, 607 F.2d at 969. Thus, the court in *Fiorentino* recognized that whether or not it previously had jurisdiction over a liberty interest claim, it did not now have jurisdiction. This court finds it significant that *Keef* never actually took the step of awarding back pay and reinstatement for a violation of a liberty interest and that, subsequently, the Court of Claims in *Fiorentino* specifically determined that it did not have the jurisdiction which would allow it to take that step.[14]

**13.** It is not significant that the plaintiff in *Fiorentino* was not a service member as respects this court's holding in the present case and the Court of Claims' holding in *Keef* because in all instances the plaintiffs were government employees.

**14.** The court notes that a recent decision of this court in *Holley v. United States*, 32 Fed.Cl. 265 (1994), addressed both *Keef* and *Fiorentino*. In *Holley*, the plaintiff was discharged "Under Honorable Conditions," a less than honorable discharge, for "Misconduct Moral Or Professional Dereliction Or In Interest Of National Security." In that case the court found such discharge stigmatizing and held that the failure to give plaintiff a pre-discharge hearing rendered the discharge invalid. The court ordered reinstatement and back pay.

As in the present action, the defendant in *Holley* argued that the court lacked jurisdiction under *Fiorentino*. However, the court in *Holley* found *Fiorentino* inapplicable. In *Holley* the court first distinguishes *Fiorentino* because it involves a civilian rather than military discharge. 32 Fed.Cl. at 275–76 n. 12. As this court stated

above, it does not find this to be a valid distinction. *Cf. Shaw v. United States*, 226 Ct.Cl. 240, 247, 640 F.2d 1254, 1258 (1981) (finding that the plaintiff's case was not distinguishable from *Fiorentino* based on his being a veteran). Certainly civilian employees are entitled to no lessor Constitutional protections than are military employees merely by virtue of their being civilians.

The *Holley* court also appears to rely on precedents which state that a General Discharge Under Honorable Conditions is a stigmatizing event to support its award of reinstatement and back pay. 32 Fed.Cl. at 275–76 n. 12. In *Sofranoff v. United States*, 165 Ct.Cl. 470, 478, 1964 WL 8547 (1964), the Court of Claims stated that a discharge under honorable conditions was less than an honorable discharge and that the issuance of any type of discharge other than an honorable one "stigmatizes the ex-serviceman." In the present case, however, plaintiff was honorably discharged and *Sofranoff*, therefore, is not applicable. Thus, *Holley* is distinguishable as it also involves a less than honorable discharge.

Finally, the *Holley* court stated in conclusion that "one could reasonably[sic] conclude that the

Continuing the court's analysis, it notes that the Tucker Act unequivocally states this court's jurisdiction is based on a statute, regulation or constitutional provision mandating payment of money by the government. 28 U.S.C. § 1491(a). It is well established that the Due Process Clause of the Fifth Amendment is not in and of itself a money mandating provision. *Connolly,* 716 F.2d at 887. Plaintiff's argument that a discharge in violation of the Due Process Clause is money mandating in this situation is to no avail. The Supreme Court has stated that the Due Process Clause requires notice and an opportunity to be heard when a liberty interest is violated. *See Board of Regents v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972) ("Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *quoting Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971)). The purpose of that hearing, however, is to give the person an opportunity to clear his name,

*Roth,* 408 U.S. at 573 n. 12, 92 S.Ct. at 2707 n. 12, and the Court has not said it necessarily requires anything more, *i.e.,* reinstatement and back pay.[15] In fact, in *Codd,* the Supreme Court stated that "the remedy mandated by the Due Process Clause of the Fourteenth Amendment is 'an opportunity to refute the charge.'" 429 U.S. at 627, 97 S.Ct. at 884 (*quoting Roth,* 408 U.S. at 573, 92 S.Ct. at 2707). More importantly, the Court continued, "the hearing required where a nontenured employee has been stigmatized in the course of decision to terminate his employment is *solely* 'to provide an opportunity to clear his name.'" 429 U.S. at 627, 97 S.Ct. at 884 (emphasis added). In this case, if in fact Mr. Lee's liberty interest has been violated, he may only be entitled to a hearing regarding removal of the stigmatizing material; he is not entitled to reinstatement and back pay.[16] *Fiorentino,* 221 Ct.Cl. at 554, 607 F.2d at 969. Since plaintiff is unable to state a claim for money damages arising out of a Due Process violation, the court must find it lacks jurisdiction.[17]

*Fiorentino* holding has no application where a discharge, ... without a hearing, is contaminated by stigmatization." 32 Fed.Cl. at 275–76 n. 12. Yet, the court in *Fiorentino* addressed just that situation. *Fiorentino,* 221 Ct.Cl. at 556, 607 F.2d at 907 (finding no jurisdiction over a claim that a former employee's liberty interest was violated when he was maligned in his files created in connection with his discharge and not given a hearing); *see also Montalvo,* 231 Ct.Cl. at 983 (citing *Fiorentino,* the Court of Claims states that violations of liberty interests in employment due to stigmatization is not within its jurisdiction). In sum, the court in *Holley* has not satisfactorily persuaded this court that *Fiorentino* is not applicable and that this court should not follow it. Thus, to the extent that *Holley* cannot be distinguished, this court must respectfully disagree with the court in *Holley* and finds *Fiorentino* both applicable and binding.

15. Plaintiff has cited no cases which state he was entitled to a *pre-termination* hearing which would enable the court to order back pay and reinstatement. Indeed, the Supreme Court has noted that the instances in which the judiciary has required a pre-termination hearing are extremely rare. *Bishop v. Wood,* 426 U.S. 341, 349 n. 14, 96 S.Ct. 2074, 2080 n. 14, 48 L.Ed.2d 684 (1976); *see also Alberico v. United States,* 783 F.2d 1024, 1028 n. 4 (Fed.Cir.1986) (stating that "[f]ailure to provide a hearing before, rather than after, termination of a property interest is not in and of itself violative of due process"). A name clearing hearing is all the Constitution

requires, *see Codd,* 429 U.S. at 624, 97 S.Ct. at 882, and plaintiff has failed to show why a post-termination hearing would not provide him a sufficient "opportunity to clear his name."

16. In any event, plaintiff is not entitled to reinstatement. Mr. Lee's established release date was November 4, 1993 and he has no right to reinstatement after that date. *Austin v. United States,* 206 Ct.Cl. 719, 724, *cert. denied,* 423 U.S. 911, 96 S.Ct. 215, 46 L.Ed.2d 140 (1975); *Barth v. United States,* 28 Fed.Cl. 512 (1993).

17. Even if the court were to find it had jurisdiction over plaintiff's liberty interest claim, plaintiff has failed to show his liberty interests under the Due Process Clause were violated. In order to satisfy his threshold burden to state a claim for deprivation of a constitutionally protected liberty interest, plaintiff must show that in the course of his discharge, the military, without notice and an opportunity to be heard, prepared a discharge form which was (1) stigmatizing, *see, Roth* 408 U.S. at 573, 92 S.Ct. at 2707, (2) false, *see Codd,* 429 U.S. at 628, 97 S.Ct. at 884, and (3) published, *see Bishop v. Wood,* 426 U.S. 341, 348, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684 (1976). *See also Biagioli,* 2 Cl.Ct. at 309 n. 8 (stating that in order to show a due process liberty interest violation, plaintiff must establish that termination report was false, stigmatizing and published).

In this case, plaintiff cannot show that the allegedly stigmatizing information was false.

As stated above, the court finds the Court of Claims decision in *Fiorentino* dispositive on the issue of this court's jurisdiction over plaintiff's liberty interest claim and binding on this court. In so doing the court recognizes that the court's decision in *Rogers* was affirmed without opinion by the Federal Circuit. However, since the question of this court's jurisdiction was not squarely before the court in that case, the court does not ascribe much precedential strength to that affirmance.

## CONCLUSION

For the reasons stated, defendant's motion is granted and plaintiff's complaint is dismissed. The Clerk of the Court is directed to enter judgment accordingly. No costs.

One of plaintiff's discharge form states as the reason for his discharge, "Substandard Performance of Duty." In order to prevail plaintiff must be able to show that this statement is false, *i.e.*, that his performance of duty was not substandard. Plaintiff in the course of his training stated that he may not be able to follow a launch order. As discussed earlier, the military has not clearly defined what constitutes substandard performance of duty. As a result, the court cannot say that plaintiff's stated inability to follow an order did not constitute substandard performance of duty. Since plaintiff is unable to show that the information on his discharge forms is false, his liberty interest claim must fail. *See Guerra v. Scruggs*, 942 F.2d 270, 278 (4th Cir. 1991) (finding that a critical element of a liberty interest violation is the falsity of the stigmatizing information).