Johnny **GILCHRIST**, Plaintiff,

v.

The **UNITED STATES**, Defendant.

No. 94–617C.

United States Court of Federal Claims.

Aug. 4, 1995.

---

Guy J. Ferrante, Falls Church, VA, for plaintiff.

Michael L. Tingle, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant. Lt. Col. Nolon J. Benson, Jr., and Maj. Douglas Mickle, Office of the Judge Advocate General, Department of the Army, of counsel.

## OPINION

MILLER, Judge.

This case is before the court after argument on cross-motions for summary judgment. Plaintiff seeks correction of his military records, reinstatement, and retroactive backpay with full benefits. The main issue to be resolved is whether plaintiff's discharge without a hearing from the military was unlawful and in violation of established military procedure and thus an abuse of the Secretary of the Army's discretionary powers.

### FACTS

The following facts are undisputed, unless otherwise noted. Johnny Gilchrist ("plaintiff") enlisted in the United States Army (the "Army") on July 22, 1981, as a non-commissioned officer. By December 1990 plaintiff had been promoted to staff sergeant (E–6), and was assigned to the 551st Signal Battalion, Fort Gordon, Georgia.

On December 19, 1990, while plaintiff shopped at the Fort Gordon Post Exchange (the "PX"), he allegedly committed larceny and conspired to commit larceny with Toni Falinda Decker, a PX employee.[1] Thereaf-

---

1. Security cameras recorded unusual behavior between plaintiff and Ms. Decker, and Ms. Deck-

ter, the Army Criminal Investigation Division (the "CID") investigated the incident and filed an official report.[2] Lieutenant Colonel ("Lt. Col." or "LTC") John M. Kenney, commander of the 551st Signal Battalion, reviewed the CID report and, on or about March 4, 1991, conducted Field Grade Article 15 proceedings against plaintiff for larceny and conspiracy.[3] Lt. Col. Kenney ultimately found plaintiff guilty and reduced plaintiff's rank to sergeant (E–5), fined plaintiff $500.00, and imposed 30 days extra duty.[4] Lt. Col. Kenney also decided to initiate elimination proceedings against plaintiff.

On June 13, 1991, plaintiff was directed to appear before a Board of Officers (the "elimination board"), which would determine whether the Army should eliminate plaintiff pursuant to AR 635–200 ¶ 14–12(c) for Misconduct—Commission of a serious offense. The elimination board convened on August 1, 1991, and plaintiff testified that he neither knew Ms. Decker, nor asked her for a discount. Plaintiff also described the PX incident:

> I really wasn't paying any attention to her ringing me up. She told me what I needed to pay, and I was shocked or stunned. I didn't say anything. I just paid her what

she asked for. I don't remember the amount she asked for, but I know it was over twenty dollars. I know it was a lot more than that. I had a lot of bills on me at the time.

Q: Did you ever consider that might not be the proper thing to do?

A: Yes, sir.

Q: What do you believe at this point you should have done?

A: I believe now, sir, as a consequence of what's going on, I should have paid the full price. I should have questioned her. I should have stopped and asked her about it.

. . . .

Q: Okay, next question, was the incident at the PX all Ms. Decker's fault?

A: Yes, sir.

Q: It was all her fault, okay. . . .

A: I didn't say it was all her fault. I admitted to that. I earlier admitted I didn't pay the full price for these items.

. . . .

Q: You didn't think it was suspicious at all when you left with several hundred dollars worth of merchandise and you only

---

er subsequently admitted that she undercharged plaintiff for a bottle of "Red" cologne. Ms. Decker maintained that she had been acquainted with plaintiff and his wife for approximately five months, and that she had undercharged plaintiff for the cologne "because he asked . . . [her], he didn't have enough money and wanted to give it to his wife for a present." Ms. Decker explained that she rang up the cologne, several articles of clothing, and a small box, and the total charge was $10.44. According to Ms. Decker, plaintiff paid with a twenty-dollar bill.

**2.** The CID report, dated February 25, 1991, states:

> DECKER . . . and GILCHRIST conspired to steal a Shinon Genesis 3 camera valued at $279.00, a bottle of Red Fragrance valued at $42.00, and assorted clothing items of unknown value. DECKER intentionally undercharged for the merchandise at her cash register, only charging GILCHRIST a total of $4.50 for the camera and cologne, resulting in a $316.50 loss to AAFES. . . ."

**3.** In a sworn statement dated September 16, 1991, Lt. Col. Kenney recounted the Article 15 proceedings and summarized plaintiff's account of the PX incident: "[Plaintiff] basically told me that he did not conspire to steal with Ms. Decker

but that he did realize that she undercharged him for the merchandise he had and that he chose to not say anything about it. . . ."

**4.** On or about March 10, 1991, plaintiff's original Article 15 paperwork disappeared from the office of command sergeant major ("Sgt. Maj." or "CSM") Samuel M. Smith, who maintained plaintiff's records. Sgt. Maj. Smith later reconstructed the Article 15 paperwork, using a copy of the original form. The reconstructed form states:

> In that you did, at Fort Gordon, GA on or about 19 December 1990, conspire with Toni F. Decker, to commit an offense under the Uniform Code of Military Justice, to wit: larceny of Red Cologne of a value of about $42.00 . . . the property of AAFES, and in order to effect the objects of conspiracy you did go to Toni F. Decker's cash register, where she intentionally undercharged you for Red Cologne. This is in violation of Article 81, UCMJ.
>
> In that you, did, [sic] at Fort Gordon, Georgia, on or about 19 December 1990, steal Red Cologne, a Shinon Genesis 3 Camera and assorted clothing, of a value of about $319.00, the property of AAFES. This is in violation of Article 121, UUCMJ [sic].

paid, let's say just twenty dollars for it? You didn't think to stop?

A: At one particular time, I did, sir.

Q: But, you didn't?

A: No, sir, I did not....

Plaintiff also testified that he did not sign any Article 15 paperwork after receiving punishment: "This whole time I've never signed the Article 15 itself. I had signed that I wanted to appeal it. That was before I even knew what I was appealing. I have not seen that Article 15 since then." Plaintiff explained that first sergeant ("1st Sgt." or "1SG") William M. English, who helped administer plaintiff's Article 15, instructed plaintiff to sign the Article 15 appeal option before Lt. Col. Kenney began the Article 15 proceedings.[5]

Staff sergeant ("S. Sgt." or "SSG") Billy Dixon, who testified during the Article 15 proceedings, verified plaintiff's account of the Article 15 proceedings. S. Sgt. Dixon explained that, at the time of the Article 15 proceedings, plaintiff told him that plaintiff had signed the appeal before receiving punishment:

5. Plaintiff's testimony follows:

Q: ... Did you sign the DA Form 2627? Were you read the charges, and did you sign that form?

A: No, sir, I signed the appeal.

....

Q: So you did see and sign the form? That's what I'm trying to find out.

A: The form said on such and such a day, SGT [sergeant] Gilchrist was charged with larceny from the PX. That's the only thing the Article 15 had up there. That was the paper I had signed....

Q: So you're saying the reconstruction is wrong? Is that what you're saying?

A: I'm saying, basically, sir, that was wrong, yes, sir, pretty much.

....

Q: So before the entire process began, you signed this appeal?

A: That is when 1SG English called me in his office. That is when I signed the appeal.

Q: You signed the appeal on the bottom of this form?

A: No, sir, I don't think it was at the bottom. I can't remember where.

Q: Where did you sign to appeal it? I don't understand.

A: I can't remember where. I think it was in the middle because it said "do you wish to appeal?" He told me to x yes and sign right beside it.

When ... [plaintiff] came back out [of the office with 1st Sgt. English], I asked him what was going on, and he said he had signed an appeal. I wanted to know why he had signed an appeal if he hadn't received any punishment yet.

He stated that's what ... [1st Sgt. English] told him to do....

1st Sgt. English, however, contradicted these statements, testifying that plaintiff chose to appeal the Article 15 after Lt. Col. Kenney completed the Article 15 proceedings and imposed punishment.[6] Similarly, Sgt. Maj. Smith indicated that plaintiff did, in fact, sign the original Article 15 paperwork.

The elimination board recommended that plaintiff be retained in the Army, finding that the allegation of misconduct was not supported by a preponderance of evidence. Additionally, Lt. Col. Don E. Ishmael, President of the Board of Officers, stated:

We find that the incident such as removal from drill sergeant status without documentation insufficient follow-up on things like your being AWOL and other incidents, lack of counseling and lack of remedial

Q: I'm still not clear what you were appealing....

A: That's what I'm saying, sir.

Q: Then why did you sign it?

A: Because, sir, I wasn't sure of what I was signing. I've never received an Article 15.... [1st Sgt. English] said, and these are his words quote, "if you want to appeal this Article 15, then sign it here." I knew I was going to receive an Article 15.

Q: Did you ever have a chance to talk to the brigade commander after that?

A: No, sir, I did not.

6. After 1st Sgt. English testified, plaintiff continued to deny that he signed the Article 15 paperwork after receiving punishment:

Q: Is 1SG [first sergeant] English accurate in saying he didn't have you sign that form in the beginning?

A: No, sir, he's not accurate.

Q: When did you make the decision as to whether you were going to appeal or not?

A: As he said, when I went in there before even going to LTC Kenney's office, he called me into the sergeant major's office. That's when he asked me if I wished to appeal the Article 15. That is the only time I had signed it. There was no punishment involved or anything. It was only the incident that occurred at the PX.

action being taken. And we find in your case the general pattern of your being reassigned rather than documentation or elimination from service.

In other words, the chain of command didn't do it's [sic] homework. Based upon looking at your evaluation and performance, we find it marginal at best. Unless you change radically, I see no future for you in the Army. However, we base these findings upon what is presented here, which we find largely circumstantial, and you did receive punishment, an Article 15, for the incident.

The elimination board, however, did not address the conflicting testimony regarding the signing of the Article 15.

In a memorandum to the Adjutant General, dated September 25, 1991, Brigadier General ("Brig. Gen.") Robert E. Gray, the Separation Authority, disapproved the findings and recommendations of the elimination board. Brig. Gen. Gray also instructed the Adjutant General to inform plaintiff that Brig. Gen. Gray would request that Headquarters discharge plaintiff for the convenience of the Government. Brig. Gen. Gray explained, however, that he would consider the case fully before contacting Headquarters.

On September 26, 1991, plaintiff received written notification that Brig. Gen. Gray intended to request a general discharge pursuant to AR 635–200, ch. 2, § III, ¶ 2–6(e) and ch. 5, § II, ¶ 5–3. The Adjutant General specified two reasons for the request: 1) the elimination board's "erroneous findings" that the allegations of larceny and conspiracy were not supported by a preponderance of evidence, and 2) plaintiff's "false swearing" during the elimination hearing. Moreover, the Adjutant General stated:

3. You admitted to stealing from the PX.... The board found that the allegation of misconduct, commission of a serious offense, was not supported by a preponderance of the evidence.... LTC Ishmael (Board President) listed the reasons for the board's findings and recommendations.... Instead of considering your admitted larceny of AAFES merchandise as serious misconduct, LTC Ishmael indicted

the chain of command for not "doing its homework." ... The Board apparently felt your chain of command failed you by not providing counseling and remedial training. Hence, the basis of the finding for retention was error, because the Board failed to consider larceny of merchandise valued at less than $100.00 as serious misconduct. If it had been convened to consider a pattern of misconduct, the Board's rationale would have been proper.

4. You made a sworn statement during the Administrative Board proceedings. You repeatedly lied under oath about the procedures used when you received an Article 15 for larceny. This amounts to a violation of Article 134 (False Swearing) of the Uniform Code of Military Justice.

a. ... you stated you were asked by 1SG English if you wanted to appeal the Article 15 *prior* to a hearing with the Battalion Commander. You further stated you elected to appeal by signing the Article 15 prior to a hearing.... When asked by LTC Ishmael, "So before the entire process began, you signed this appeal," you replied, "That is when I signed the appeal." ... Contrary to what you stated under oath, the Article 15 procedural requirements were complied with by the Acting Command Sergeant Major and the Battalion Commander.... 1SG English's testimony demonstrates that the Article 15 proceedings were not violated. When LTC Ishmael asked him whether the option to appeal was given before sentencing or after, 1SG English stated, "It's always after the punished [sic] is administered by the battalion Commander...." 1SG English also stated he was testifying from memory....

b. In addition to 1SG English's testimony at the Board, 1SG English and LTC Kenney (Battalion Commander) have rendered sworn statements explaining the procedures used to administer the Article 15. In his sworn statement, 1SG English stated he read the charges of the Article 15 to you and informed you of your appointment with Trial Defense Services. He further stated he gave you a copy of the charges and supporting documents....

After you reported to LTC Kenney for your hearing, he specifically remembers reading the charges, asking if you understood the charges, asking if you had seen a lawyer, and reviewing your election for Article 15 proceedings instead of trial by Court–Martial.... LTC Kenney then verified all of the elections on the form. He stated, "At that point there was no indication of an appeal because I had not heard SSG Gilchrist's side of the story and thus had not decided his innocence or guilt." ... 1SG English stated you were advised of your right to appeal by LTC Kenney after you were informed of your punishment.... Although LTC Kenney cannot independently recall this, he stated that his standard procedure is to read directly from the form....

The Adjutant General also explained that, although Brig. Gen. Gray would request a general discharge, Headquarters could order either an honorable or a general discharge. Additionally, the Adjutant General informed plaintiff of his right to seek counsel, to submit a written response, and to acquire copies of documents that would accompany the request for discharge.[7]

On October 9, 1991, plaintiff submitted a written rebuttal and requested that Brig. Gen. Gray approve the elimination board findings. Plaintiff did not rebut the charge that plaintiff admitted to larceny during the elimination hearing; rather, plaintiff acknowledged having "a full and fair opportunity to challenge the allegations" of misconduct when he appeared before the elimination board. Plaintiff also raised several additional issues, including 1) plaintiff's contention that the elimination board's findings were fair and reasonable and did not need to be reviewed, 2) plaintiff's argument that the charge of false swearing was unfair and unfounded, 3) the possibility of constitutional Due Process violations, and 4) plaintiff's contention that regulations were further violated because his separation was for a different separation reason—his having been separated, according to the Army, for reasons other than those recommended by the elimination board. The administrative record does not indicate whether Brig. Gen. Gray took any action in response to plaintiff's written rebuttal.

By letter dated November 6, 1991, Brig. Gen. Gray, the Separation Authority, requested that Headquarters discharge plaintiff for the convenience of the government. Brig. Gen. Gray "based [the request] upon the ... [elimination] Board's erroneous finding that the allegation of misconduct, commission of a serious offense, was not supported by the preponderance of the evidence...." Brig. Gen. Gray also offered the following reasons to justify the request:

2. ... On or about 1 March 1991, SGT Gilchrist received a Field Grade Article 15 for conspiring with another individual, an AAFES cashier, on 19 December 1990 to steal a bottle of Red cologne of a value of about $42.00 from the AAFES.... This conspiracy was in violation of Article 81, UCMJ. SGT Gilchrist was also punished pursuant to this Field Grade Article 15 for larceny of $319.00 worth of assorted merchandise, including the Red cologne, from the AAFES ... also occurring on 19 December 1990. These offenses were the basis for initiating the administrative board under AR 635–200, paragraph 14–12c.

3. During the board proceedings, SGT Gilchrist admitted stealing from the AAFES ... on 19 December 1990.... Despite these admissions, the Board found that the allegation of misconduct, commission of a serious offense, was not supported by a preponderance of the evidence.... In reaching their decision, the Board President chastised the Respondent's Chain of Command for not "doing its homework." ... The Board apparently believed that the Respondent's Chain of Command failed him by not providing additional counseling or remedial training and that this was enough to militate against his admitted theft of AAFES property. It was illogical for the Board not to consider larceny of AAFES merchandise

---

7. The Adjutant General indicated that three items would accompany the request for discharge: A transcript of the elimination board hearing; sworn statements of 1st Sgt. English and Lt. Col. Kenney, dated September 16, 1991; and a videotape of the PX incident.

as serious misconduct, especially since the Respondent admitted to this crime during the board proceeding.

4. Additionally, the Respondent repeatedly lied under oath at the board proceeding about the procedures used when he received the Field Grade Article 15 for the conspiracy and larceny of AAFES property. The Respondent stated that he was asked by 1SG English, the acting Command Sergeant Major, if he wanted to appeal the Article 15 *prior* to a hearing with the Battalion Commander. The Respondent further stated that he had to make his election to appeal by signing the Article 15 prior to a hearing.... Contrary to what the Respondent stated under oath, the Article 15 procedural requirements were complied with by the acting Command Sergeant Major and the Battalion Commander. 1SG English's testimony during the board proceeding demonstrated that the Article 15 proceeding did not violate his due process.... In addition to 1SG English's testimony at the Board, 1SG English and LTC Kenney, the Respondent's Battalion Commander, rendered sworn statements explaining the procedures used to administer the Field Grade Article 15 given to Sergeant Gilchrist for the conspiracy and larceny of AAFES merchandise....

(Emphasis in original.) In conclusion Brig. Gen. Gray wrote:

Because of the nature and circumstances of the offense involved, i.e., the falsely sworn testimony given by the Respondent, and the admissions made by the respondent to the larceny of PX property, I strongly believe that discharge of SGT Gilchrist is warranted and in the best interest of the Army.

Brig. Gen. Gray enclosed the letter from the Adjutant General to plaintiff, the sworn statements by Lt. Col. Kenney and 1st Sgt. English, plaintiff's rebuttal letter, a transcript of the elimination board hearing, and a videotape of the PX incident.

On or before June 16, 1992, the Assistant Secretary of the Army for Manpower and Reserve Affairs "carefully reviewed" the recommendations and approved Brig. Gen.

Gray's request for discharge. Accordingly, on June 25, 1992, plaintiff received a General Discharge under Honorable Conditions pursuant to AR 635–200, ¶ 5–3. The Certificate of Discharge specifies a "JFF" separation code and reentry code 3. JFF signals that plaintiff received an involuntary discharge by Secretarial Authority. Reentry code 3 indicates that plaintiff may not enlist in the Army without a waiver.

On September 21, 1994, plaintiff filed this action in the United States Court of Federal Claims. Plaintiff seeks backpay to June 30, 1992, retroactive reinstatement to active duty, and correction of his military records.

Plaintiff argues that he was entitled to a hearing prior to discharge, that he was not separated for a different separation reason, that the Separation Authority violated regulations by disapproving the board's recommendation and not receiving the advice of counsel, and that his Due Process rights were violated. Defendant counters that no hearing was required, that all other regulations were followed by the Secretary, and that this court lacks jurisdiction over plaintiff's Due Process claims.

## DISCUSSION

The parties' cross-motions implicate summary judgment, because they rely on the administrative record. *Long v. United States,* 12 Cl.Ct. 174, 177 (1987) ("[J]udicial review should be limited to the record developed before the military review board...."). Defendant also moved to dismiss plaintiff's Due Process claim for lack of jurisdiction.

### 1. *Jurisdiction*

■ "The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress...." 28 U.S.C. § 1491(a)(1) (1988 & Supp. V 1993). To invoke jurisdiction under the Tucker Act, a plaintiff must show that the particular provision upon which he or she brings the action "confer[s] a substantive right to recover money damages from the United States...." *United States v. Testan,* 424 U.S. 392, 398, 96

S.Ct. 948, 953, 47 L.Ed.2d 114 (1976); *see Eastport Steamship Corp. v. United States,* 372 F.2d 1002, 1007 (1967) (holding that claims brought under Tucker Act, expressly or impliedly, must seek money damages). "[T]he court shall have exclusive jurisdiction to grant declaratory judgments and such equitable and extraordinary relief as it deems proper...." 28 U.S.C. § 1491(a)(3). *See Murphy v. United States,* 993 F.2d 871, 872 (Fed.Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 1402, 128 L.Ed.2d 75 (1994) (ruling that retired Air Force reserve officer's claim seeking backpay under 37 U.S.C. § 204 (1988), reinstatement, and correction of records within jurisdiction of Court of Federal Claims).

Since plaintiff brings this action pursuant to 37 U.S.C. § 204(a)(1), entitling "a member of a uniformed service who is on active duty" to "basic pay," his statutory claim satisfies the jurisdictional requirements of the Tucker Act. *See Sanders v. United States,* 219 Ct.Cl. 285, 296–97, 594 F.2d 804, 810–11 (1979) (holding that claim of former Air Force serviceman of illegal discharge and entitlement to payment under 37 U.S.C. § 204 within jurisdiction of the Court of Claims).

*2. Justiciability*

Although jurisdiction is present, defendant questions whether the claim is justiciable. *See Sargisson v. United States,* 913 F.2d 918, 921 (Fed.Cir.1990). Justiciability depends upon "whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded...." *Baker v. Carr,* 369 U.S. 186, 198, 82 S.Ct. 691, 700, 7 L.Ed.2d 663 (1962). A case is thus reviewable and justiciable only if it is "'one which the courts can finally and effectively decide, under tests and standards which they can soundly administer within their special field of competence.'" *Voge v. United States,* 844 F.2d 776, 780 (Fed.Cir.), *cert. denied,* 488 U.S. 941, 109 S.Ct. 365, 102 L.Ed.2d 355 (1988) (quoting *Greene v. McElroy,* 254 F.2d 944, 953 (D.C.Cir.1958), *rev'd on other grounds,* 360 U.S. 474, 79 S.Ct.

1400, 3 L.Ed.2d 1377 (1959)) (citations omitted).

The court shall not infringe upon the rights and duties of other administrative agencies when attempting to respond to a claim. If a court finds a matter nonjusticiable, then it must "abstain" from review. *Murphy,* 993 F.2d at 873. Exercise of such discretion is particularly necessary when reviewing military actions. The Supreme Court has ruled that the judiciary must be "scrupulous not to interfere with legitimate Army matters." *Orloff v. Willoughby,* 345 U.S. 83, 94, 73 S.Ct. 534, 540, 97 L.Ed. 842 (1953); *see Birt v. United States,* 180 Ct.Cl. 910, 913, 1967 WL 8881 (1967) ("[W]e may test the validity of a discharge only in terms of its legal sufficiency and not in terms of the military's wisdom in discharging one of its members...."); *see also Boyd v. United States,* 207 Ct.Cl. 1, 9, 1975 WL 22807 (1975), *cert. denied,* 424 U.S. 911, 96 S.Ct. 1106, 47 L.Ed.2d 314 (1976) ("[D]iscretion is not to be interfered with lightly, especially in view of the courts' traditional reluctance to involve themselves in internal affairs of the military, in which they have little or no special competence and less responsibility....") (citations omitted). "[J]udicial review is only appropriate where the Secretary's discretion is limited, and Congress has established 'tests and standards' against which the court can measure his conduct...." *Murphy,* 993 F.2d at 873 (citation omitted).

Plaintiff argues that all aspects of his claim involving his discharge for the convenience of the Government are justiciable. Although AR 635–200, ¶ 5–3 (Oct. 17, 1990), the regulation pursuant to which plaintiff was discharged, provides no standard to review the merits of the discharge, *i.e.,* whether the Secretary's decision that plaintiff was unsuitable for continued service was valid, the regulation does provide standards that govern the procedural aspects of the discharge. Because the primary claim in plaintiff's case is procedural, *i.e.,* whether or not a hearing prior to discharge was required by both AR 635–200 and DOD Directive 1332.14 (Jan. 28, 1982), the claim is justiciable. *See Voge,* 844 F.2d at 779. If the court finds that required procedures were violated in connection with

plaintiff's discharge, the substantive merits of the Secretary's decision are justiciable to the extent that the court can decide whether or not the resultant decision was "arbitrary, capricious, contrary to law or unsupported by substantial evidence." *Wronke v. Marsh,* 787 F.2d 1569, 1576 (Fed.Cir.), *cert. denied,* 479 U.S. 853, 107 S.Ct. 188, 93 L.Ed.2d 121 (1986) (citations omitted); *see Doty v. United States,* 53 F.3d 1244, 1252 (Fed.Cir.1995) (holding that court's review of agency action encompasses only "whether, on the grounds on which the agency relied for the action that it took, the agency action constituted arbitrary or capricious conduct, or was an abuse of the agency's discretionary authority, or violated an applicable statute or regulation.").

3. *Did denial of a hearing prior to discharge violate the applicable regulation or directive?*

a. *AR 635–200*

 Discharge from the armed services pursuant to AR 635–200, ch. 2, § III, ¶ 2–6(e), requires that a recommendation for separation in the best interests of the Army be forwarded to Secretarial Authority under ¶ 5–3 of AR 635–200.[8] Plaintiff was discharged pursuant to ¶ 2–6 and ¶ 5–3, "Separation authority action after board hearings" and "Secretarial Authority," respectively. Paragraph 5–3 of AR 635–200 accords the Secretary of the Army plenary authority to discharge personnel for the convenience of the Government based upon a recommendation for separation under ¶ 2–6(e).[9] Any decision made by the Secretary of the Army pertaining to discharge of personnel is discretionary, and the court "will not substitute . . . [its] judgment for the board's when reasonable minds could reach differing conclusions. . . ." *Sanders,* 219 Ct.Cl. at 302, 594 F.2d at 814 (citing *Snell v. United States,* 168 Ct.Cl. 219, 227, 1964 WL 8544 (1964)). This court can only determine whether the proce-

dures employed to discharge plaintiff under Secretarial Authority violated AR 635–200.

Plaintiff maintains that the Secretary abused his discretion by not affording plaintiff a hearing prior to discharge. In plaintiff's view a hearing was required for his separation under ¶¶ 2–6 and 5–3. Specifically, plaintiff contends that the hearing should have been held after the Separation Authority recommended separation over retention.

Paragraph 2–6(e) specifies that, when an officer is discharged under ¶ 5–3 (Secretarial Authority), he is so discharged because the Separation Authority recommends separation in the best interests of the Army over the elimination board's recommendation for retention. Paragraph 2–6(e) further states that, in such cases, "the procedure for requesting consideration by an administrative board (para 2–2d) is not applicable." AR 635–200, ch. 2, § III, ¶ 2–6(e)(1). Plaintiff apparently relies on AR 635–200, ch. 2, § II, ¶ 2–2(d), which provides that a servicemember is entitled "[t]o a hearing before an administrative separation board under section III if he or she had 6 or more years of total active and reserve service on the date of initiation of recommendation for separation." Although ¶ 5–3 provides for this general notification procedure, it limits that procedure by stipulating that "the procedure for requesting an administrative board (¶ 2–2d) is not applicable." AR 635–200, ch. 5, § II, ¶ 5–3.

Neither ¶ 2–6(e)(1) nor ¶ 5–3 requires a hearing when a soldier is discharged for the convenience of the Government under Secretarial Authority. The Army was not required to conduct a hearing before the Secretary determined to discharge plaintiff.

b. *DOD Directive 1332.14*

 Plaintiff also argues that AR 635–200 conflicts with DOD Directive 1332.14. The DOD Directive is the controlling authority over the Army regulation. "[T]o the extent that Army regulations conflict with

---

**8.** AR 635–200, ch. 2, § III, ¶ 2–6(e) states:

(e) When a board of officers has recommended retention and the separation authority believes that discharge is warranted and in the best interest of the Army, a request for discharge for the convenience of the Government per

paragraph 5–3, may be forwarded to HQDA. . . .

**9.** "The separation of soldiers for the convenience of the Government is the prerogative of the Secretary of the Army (SA). . . ." AR 635–200, ch. 5, § II, ¶ 5–3.

those of the Department of Defense, the service regulations must give way." *Casey v. United States,* 8 Cl.Ct. 234, 239 (1985); *see Poole v. Rourke,* 779 F.Supp. 1546, 1565 (E.D.Cal.1991) ("Department of Defense regulations control when they conflict with regulations promulgated by the Air Force.") (citations omitted). If it were found that DOD 1332.14 conflicts with AR 635–200, *i.e.,* that plaintiff did have a right to a hearing, the DOD Directive would control. Plaintiff asserts that the directive provides for a hearing prior to discharge for convenience of the Government. Defendant rejoins that the provision on discharge concerning Secretarial Authority, which is the reason cited for discharge on plaintiff's discharge papers, appears in a different section of the directive that plaintiff does not address. The section of the directive cited by plaintiff, part 1, § C, does not cover discharge through Secretarial Authority, which occurred in plaintiff's case, and must be cross-referenced to another section of the Directive—part 1, § O on "Secretarial Plenary Authority."

DOD Directive 1332.14 has the same basic format as AR 635–200, which the latter was designed to implement. An officer may be separated for the convenience of the Government under part 1, § C [10], but through Secretarial Authority [11] under part 1, § O, just as in ¶ 5–3 of AR 635–200, which allows the Secretarial Authority to separate the soldier on the basis of the best interests of the Army after recommendation by the Separation Authority under ¶ 2–6(e). Certain notification procedures differ under the various sections of 1332.14, depending upon the conditions under which the separation occurred, *i.e.,* through Secretarial Authority or otherwise. DOD Directive 1332.14, part 1, § C.3 states that "[p]rocedural requirements may be established by the Secretary concerned, ..."

**10.** DOD Directive 1332.14, part 1, § C.1 provides:
C. *Convenience of the Government*
1. *Basis.* A member may be separated for convenience of the government for the reasons set forth....

**11.** DOD Directive 1332.14, part 1, § O.1 states:
O. *Secretarial Plenary Authority*
1. *Basis.* Notwithstanding any limitation on separations provided in this Directive, the

The same section, entitled "Convenience of the Government" calls for the general notification procedures to be utilized.[12] That procedure, DOD Directive 1332.14, part 3, § B.1.g, grants a soldier the right to an administrative board if the soldier has six or more years of service, as does ¶ 2–2(d) of AR 635–200.

If plaintiff were simply discharged for the convenience of the Government, part 1, § C.3 likely would apply. Although plaintiff was discharged for the convenience of the Government, his discharge was filed under separation code "JFF;" which denotes Secretarial Authority. No doubt exists that plaintiff was discharged at the behest of the Secretary and that, therefore, his discharge was processed correctly under § O. As AR 635–200, which qualifies such discharge under the separate section of ¶ 5–3 (under which plaintiff was discharged), DOD Directive 1332.14, part 1, § O, entitled "Secretarial Plenary Authority," provides for a convenience of the Government discharge if in the best interests of the Army under the aegis of Secretarial Authority. This section reads:

3. *Procedures.* Prior to involuntary separation, the Notification Procedure (section B. of Part 3) shall be used, except the procedure for requesting an Administrative Board (paragraph B.1.g of Part 3) is not applicable.

Additionally, DOD 1332.14, part 3, § C.6.d.2 provides for the procedures for separation once the matter reaches the Separation Authority, which effectively places the matter under Secretarial control. It provides:

(2) If the Board recommends retention, the Separation Authority may take one [sic] the following actions:

(1) Approve the recommendation.

Secretary concerned may direct the separation of any member prior to expiration of term of service after determining it to be in the best interests of the Service.

**12.** DOD Directive, Part 1, § C.3 provides:
3. *Procedures* .... Prior to characterization of service as General (under honorable conditions) ... the Notification Procedure (section B. of Part 3) shall be used....

(2) Forward the matter to the Secretary concerned with a recommendation for separation based upon the circumstances of the case. In such a case, the Secretary may direct retention or separation. If the Secretary approves separation, the characterization of service or description of separation will be Honorable, General (under honorable conditions) or an Entry Level Separation under the guidance in section C. of Part 2....

No provision, other than § O, "Secretarial Plenary Authority," permits such a recommendation for separation to be made. Because the matter falls under § O, no hearing is required under either DOD Directive 1332.14 or AR 635–200. Thus, the two regulations are not in conflict; plaintiff did not have the right to a hearing.

4. *Did the Separation Authority commit a procedural violation when he "disapproved" the elimination board's findings?*

■ Plaintiff maintains that the Separation Authority violated Army regulations when the Separation Authority "disapproved" the "findings and recommendations of the Board of Officers in the case of SGT Johnny Gilchrist." Specifically, plaintiff argues that AR 635–200 was violated because the following provision was not followed:

The separation authority will neither approve nor disapprove the findings and recommendations of the board, since forwarding the case to HQDA under this paragraph constitutes the separation authority's initial action on the case. No further action will be taken on the findings or recommendations of the board of officers unless directed by HQDA....

AR 635–200, ch. 2, § III, ¶ 2–6(e)(4). Plaintiff asserts that the Army violated its own procedure when the Separation Authority utilized the word "disapproved" when deciding to recommend separation of plaintiff to the Secretary of the Army, contrary to the findings of the elimination board. Specifically, plaintiff argues that the Separation Authority terminated the discharge proceedings by his use of the word "disapproved." Defendant counters that the Separation Author-

ity's choice of words in recommending plaintiff's dismissal to HQDA is simply one of "semantics." Def's Br. filed May 26, 1995, at 4.

■ The Separation Authority does have the power to forward a "request" to HQDA to separate a member of the service after a board has recommended retention if he finds it in the best interest of the Army. AR 635–200, ch. 2, § III, ¶ 2–6(e); *see Jones v. United States,* 7 Cl.Ct. 673, 679 (1985) (holding that Secretary was within his power to overrule board's recommendation for retention in favor of separation). Any such finding by the Separation Authority places the discharge proceeding under ¶ 5–3, "Secretarial Authority," which takes any further action in the discharge process out of the power of the Separation Authority. Specifically, ¶ 2–6(e)(4) of AR 635–200 stipulates that the forwarding of the Separation Authority's recommendation to separate the soldier is only the "initial action" in the discharge process. DOD 1332.14, part 3, § C.6.d.2 also characterizes the Separation Authority's action in recommending separation over retention as an action to "[f]orward the matter" to the Secretarial Authority.

■ Plaintiff was not discharged as a result of the Separation Authority's incorrect choice of words. The Secretary of the Army discharged plaintiff after receiving and reviewing the Separation Authority's recommendation for discharge. The Secretarial Authority then decided that plaintiff's discharge would be in the best interests of the Army, agreeing with the analysis of the Separation Authority. Plaintiff offers no authority to support his proposition that the Separation Authority's choice of words terminated the action. The Separation Authority acts within the scope of his power under AR 635–200 when forwarding a recommended separation to the Secretarial Authority. The Separation Authority did make a mistake in utilizing the term "disapproved;" however, because the matter was forwarded as a recommendation to the appropriate forum for determination, the action cannot be deemed other than harmless error. The Secretary acts under his own powers, as described in

both AR 635–200 and DOD 1332.14, when he decides that a soldier's separation is in the best interests of the Army. *See Keef v. United States,* 185 Ct.Cl. 454, 462, 1968 WL 9154 (1968) ("There is no requirement that the discharge authority 'rubber-stamp' the board's recommendation without making his own evaluation of the case."). Both the Separation Authority and the Secretarial Authority followed the applicable regulations in plaintiff's case insofar as the matter was processed correctly. That the Separation Authority incorrectly characterized his actions does not invalidate plaintiff's discharge.

5. *Does the record show that plaintiff was separated for a reason other than that considered by the elimination board?*

■ Plaintiff contends that the Army violated required procedure because his discharge under ¶ 5–3 of AR 635–200 was not effected for a "different separation reason," *i.e.,* that the Secretary did not base his decision on a ground other than the elimination board's investigation into charges of larceny. AR 635–200, ch. 2, § III, ¶ 2–6(e). Specifically, plaintiff argues that a literal reading of ¶ 2–6(e) supports his assertion that he was processed incorrectly. That provision states:

> Separation under the provisions of paragraph 5–3 is a different separation reason, based upon different criteria from that considered by the board of officers and does not constitute overturning the board. It is the policy of HQDA not to direct separation per paragraph 5–3 when a duly constituted board has recommended retention unless sufficient justification is provided to warrant separation by the Secretary of the Army, based on all the circumstances, as being in the best interest of the Army....

Plaintiff maintains that the Separation Authority's finding that the results of the elimination board hearing were "erroneous" is not sufficient justification for his discharge. Ac-

cording to plaintiff, the decision to separate him contrary to the board's recommendation to retain him is per se an "overturning of the board" under ¶ 2–6(e). Plf's Br. filed Apr. 7, 1994, at 12. AR 635–200, ¶ 2–6(e), however, simply states that separation procedures, once initiated under a recommendation by the Separation Authority, fall under a separate and distinct reason for separation—¶ 5–3, "Secretarial Authority."

■ A close reading of AR 635–200 and the supporting case law concerning military personnel decisions discloses that the power of the Secretary to effect a discharge in the best interest of the Service is one that lies wholly within his discretion. *See Jones,* 7 Cl.Ct. at 679 ("[T]he decision of a service secretary is deemed to be final unless it can be shown by clear and convincing evidence to be arbitrary, capricious, in bad faith, unsupported by substantial evidence, or contrary to applicable law or regulation....") (citations omitted). The Secretary is not precluded from reviewing the record as a whole. As defense counsel stated during argument, the Secretary is concerned with the entire circumstances surrounding a case, as well as the impact of those circumstances upon the Service. Under both AR 635–200 and DOD 1332.14, that power is plenary; therefore, the Secretary may disagree with the findings of an administrative board. *Boyd,* 207 Ct.Cl. at 8. (" '[W]e do not suggest that the Secretary may not overrule the recommendations of the Correction Board where the findings of that Board are not justified by the record on which the findings were made.' ") (quoting *Proper v. United States,* 139 Ct.Cl. 511, 526, 154 F.Supp. 317, 326 (1957)); *Keef,* 185 Ct.Cl. at 462 ("[T]here is no requirement that the discharge authority 'rubberstamp' the board's recommendation without making his own evaluation of the case.").

The initial charge brought against plaintiff in the elimination board proceedings was under AR 635–200, ch. 14–12(c), § III "Separation for Misconduct," [13] a separate process

---

**13.** The initial memorandum notifying plaintiff of the elimination board proceedings, dated June 13, 1991, stated, in part:

> Under the provisions of AR 15–6 and paragraph 14–12(c) of AR 635–200, you are hereby

notified to appear before a board of officers ... to determine whether you should be eliminated from the military service because of: Misconduct—Commission of a serious offense.

from that under which plaintiff's final discharge was effected. The actual discharge was processed under applicable provisions of ¶¶ 2–6(e) and 5–3, convenience of the Government through Secretarial Authority. Plaintiff was separated for a different separation reason: ¶ 2–6(e) states that separation under ¶ 5–3—the Secretary's decision that a discharge would be in the best interests of the Army—is a different separation reason. This reason for discharge appears on plaintiff's discharge certificate, under separation code "JFF," which denotes "Secretarial Authority." Had the discharge been for the same reason upon which the elimination board made its findings, the release form would have been filed under chapter 14, for "misconduct—commission of a serious offense." Discharge under ¶ 14–12(c) restricts the codes used upon discharge certificates to "JKF," "JKD," "JKK," or "JKQ," each of which corresponds to separation for "Misconduct" under ¶ 14–12(c). AR 635–5, Table C.1. Plaintiff was discharged for the separate reason of Secretarial Authority, not Misconduct. As such, the separation is consistent with regulation.

### 6. *Is there evidence to suggest Separation Authority did not receive advice of counsel?*

 Plaintiff asserts that the Army violated regulation because the administrative record is devoid of any evidence that the Separation Authority was given the benefit of legal counsel prior to recommending separation under ¶ 5–3, arguing that the "absence of any legal review ... is *prima facie* evidence that none exists...." Plf's Br. July 10, 1995, at 13 (emphasis in original). AR 635–200, ch. 2, § III, ¶ 2–6(e)(3) provides:

> If the soldier's response specifies legal issues for consideration, a member of the Judge Advocate General's Corps or legal advisor who has not previously acted as a board member, recorder, counsel for consultation, or counsel for representation in the prior separation action will review the

**14.** The letter notifying plaintiff of the Separation Authority's action stated, in relevant part:
> 11. Any statement you desire to make must be submitted to the Office of the Staff Judge

response and advise the separation authority thereon.

Both plaintiff and defendant agree that the record reveals little or no evidence either way—to show that the Separation Authority did receive legal advice or to show that he did not. Defendant argues that because any rebuttal made by the plaintiff was sent directly to the Office of the Staff Advocate General,[14] it was reviewed by that office upon receipt. As a result, defendant contends, the Staff Advocate General did not act "merely as a mailstop." Def's Br. filed May 26, 1995, at 16. As defense counsel explained at argument, ¶ 2–6(e)(3) does not require any written proof of this review. Defendant's argument is plausible. The Army is entitled to a presumption of regularity when the record suggests nothing to dispel it. *See Sanders,* 219 Ct.Cl. at 302, 594 F.2d at 813 ("[P]roof must overcome the strong, but rebuttable, presumption that administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith....") (citations omitted).

### 7. *Was plaintiff separated for unverified allegations?*

Plaintiff further contends that the Separation Authority and the Secretary abused their discretionary powers by concluding that plaintiff admitted to larceny and was guilty of false swearing.

#### a. *Larceny*

 Plaintiff argues that there was no justification for the Separation Authority's conclusion that he had admitted to stealing from the PX during the elimination board hearing. According to plaintiff, he admitted only that he "took advantage of the cashier's mistake." Plf's Br. filed Apr. 7, 1994, at 16. Defendant argues that plaintiff's own testimony amounts to an admission that he stole. Plaintiff fails to note a vital element of this testimony, signifying that plaintiff was aware, at the time of purchase, that his actions were wrong:

> Advocate, Administrative Law Division within 7 duty days after you receive this letter....

A: ... I didn't say anything. I just paid her what she asked for. I don't remember the amount she asked for, but I know it was over twenty dollars....

Q: Did you ever consider that might not be the proper thing to do?

A: Yes, sir.

....

Q: You didn't think it was suspicious at all when you left with several hundred dollars worth of merchandise and you only paid, let's say just twenty dollars for it? You didn't think to stop?

A: At one particular time, I did, sir.

Q: But, you didn't?

A: No, sir, I did not.

A plausible inference could arise from this testimony that, in continuing with the transaction, plaintiff committed a "wrongful taking" under the Uniform Code of Military Justice, 10 U.S.C. § 921 (1988).

Defendant cites to *United States v. Neff,* 34 M.J. 1195 (AFCMR 1992), for the proposition that plaintiff's knowledge that he was being undercharged significantly at the time that he paid the cashier amounted to a "larceny by a constructive trespass." *Id.* at 1203. *Neff* states that "[a] larceny by a constructive trespass occurs when the owner mistakenly gives the taker more than the taker was due *and the taker discovers the error before he acquires lawful possession,* but, without disclosing the error, takes the excess with the intent of converting it to his own use." *Id.* (emphasis in original) (citing *United States v. Posner,* 408 F.Supp. 1145, 1151 (D.Md.1976), *aff'd* 551 F.2d 310 (4th Cir.1977), *cert. denied,* 434 U.S. 837, 98 S.Ct. 127, 54 L.Ed.2d 99 (1977)). According to *United States v. Moreno,* 23 M.J. 622, 626 (AFCMR 1986), "any movement or exercise of dominion over the property is sufficient to constitute a larcenous taking...."

Plaintiff contends that the outcome in *Neff,* which did not label the conduct as criminal, forecloses defendant from taking the position that plaintiff admitted to stealing. Plaintiff fails to note that *Neff* also states that larceny may occur under false pretense "through silence or failure to correct a known misrepresentation of another if the accused is under a legal duty to speak...." *Neff,* 34 M.J. at 1205 (citation omitted). Unlike *Neff,* wherein the court found no evidence that the appellant had spoken to anyone prior to purchase, the record in this case reveals that plaintiff did engage in questionable conduct. Specifically, there is a sworn statement by Ms. Decker, the cashier at the PX the day that plaintiff was accused of stealing:

Q: Why did you not charge him [Gilchrist] for the cologne?

A: Because he asked me, he didn't have enough money and wanted to give it to his wife for a present.

Q: When did he ask you to not charge him?

A: While I was ringing him up.

Q: What did he exactly say?

A: Dont [sic] charge me that much ...

Q: What did his total come to?

A: His total came to $10.44.

....

Q: What was in the box?

A: I thought the box was a box of tapes, I didn;t [sic] know that it was a camera I really didn't....

"[I]f the silence is preceded by a prior act or statement by the accused that is a material factor in causing the owner to relinquish his property, the crime of larceny by false pretense may occur...." *Neff,* 34 M.J. at 1205 (citations omitted); *see United States v. Vorda,* 34 M.J. 725, 726 (NMCMR 1991).

▆▆▆▆ This court need only determine whether there was sufficient evidence for the Army to reach the conclusion that it did, not whether the substantive decision made was correct. *See Consolidated Edison v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938) (Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citations omitted). The Secretary is not precluded from looking at the entire record to determine the outcome of a separation proceeding. Plaintiff knew that his conduct was not proper, yet he continued in his transaction and admitted as much during his hearing. The Army had sufficient evidence to reach the conclusion that plaintiff had com-

mitted an act of larceny and admitted as much in his testimony during his elimination board hearing.

### b. *False Swearing*

█ Plaintiff asserts that there is no basis for the Separation Authority's charge that he lied under oath. This court need only find that there was substantial evidence to support the Separation Authority's finding. Plaintiff testified that he signed the papers which would indicate his desire to appeal several days prior to receiving punishment, contrary to regulation, which requires that signing occur after imposition of punishment. The record contains the sworn statements of two witnesses, 1st Sgt. English and LTC Kenney, to the effect that plaintiff had signed the appeal for Article. 15 proceedings after receiving his punishment. Plaintiff rejoins that, even assuming the two witnesses were "factually accurate," plaintiff could be guilty of a "faulty memory." Plf's Br. filed Apr. 7, 1994, at 18. Plaintiff also proposes that the testimony of SSG Dixon corroborated his own testimony.[15] SSG Dixon's testimony is, as defendant argues, not "first-hand," Def's Br. filed May 26, 1995, at 18 n. 3, as he was not present in the room when plaintiff allegedly signed the appeals papers. The two witnesses for the Government were "first-hand" observers. Their testimony is corroborative. The finding that plaintiff lied under oath was within the Secretary's discre-

tion, based upon the evidence in the record. Neither the Separation Authority nor the Secretary abused his authority.

### 8. *Did the denial of a hearing violated plaintiff's Due Process rights?*

█ Plaintiff argues that a constitutionally protected liberty interest under the Due Process clause has been violated. This court has ruled that no procedural violations of either AR 635–200 or DOD 1332.14 occurred. Relying on *Fiorentino v. United States*, 221 Ct.Cl. 545, 554–55, 607 F.2d 963, 969 (1979), *cert. denied*, 444 U.S. 1083, 100 S.Ct. 1039, 62 L.Ed.2d 768 (1980), defendant argues that this court lacks jurisdiction to hear plaintiff's claim, insofar as it invokes the Constitution. *Fiorentino*, a civilian pay case, held that, since the only relief that a Due Process violation would afford is a name-clearing hearing, Tucker Act jurisdiction cannot be grounded on such a constitutional claim. This court agrees with the reasoning in *Fiorentino*.[16] Jurisdiction is lacking to hear a claim based on denial of due process.

### CONCLUSION

Accordingly, based on the foregoing, defendant's motion for summary judgment is granted, and plaintiff's cross-motion is denied. The Clerk of the Court shall enter judgment dismissing the complaint.

---

**15.** The relevant testimony of SSG Dixon, upon which plaintiff relies, follows:

> When he came back out, I asked him what was going on, and he said he had signed an appeal. I wanted to know why he had signed an appeal if he hadn't received any punishment yet.
>
> He stated that's what the first sergeant told him to do....

**16.** Defendant argues that the holding in *Fiorentino* is controlling as it was applied in a military pay case, *Lee v. United States*, 32 Fed.Cl. 530 (1995), which held that *"Fiorentino* is ... persuasive and, therefore, is dispositive on the issue of this court's jurisdiction...." *Id.* at 545. The court in *Lee* reasoned that, although some prior cases had assumed jurisdiction over such claims, *Fiorentino* was the first case which "squarely addressed this court's jurisdiction to hear a claim based on violation of a liberty interest and found it lacking." *Id. But see Keef*, 185 Ct.Cl. 454 (holding, prior to decision in *Fiorentino*, but without challenge to jurisdiction, that former ser-

viceman's allegations that his discharge for convenience of Government violated both regulation and Due Process rights could be considered).

*Lee* also discussed *Holley v. United States*, 32 Fed.Cl. 265 (1994), *appeal docketed*, No. 95–5134 (Fed.Cir. July 20, 1995), holding that, because plaintiff's discharge was a general discharge under honorable conditions and a procedural violation existed, *Fiorentino* did not apply. *See Holley*, 32 Fed.Cl. at 275–276 n. 12. ("In any event, one could reasonably conclude that the *Fiorentino* holding has no application where a discharge ... without a hearing, is contaminated by stigmatization.") (citations omitted). The *Lee* court found that *Holley* did "not satisfactorily [persuade] this court that *Fiorentino* is not applicable and that this court should not follow it...." *Lee*, 32 Fed.Cl. at 546 n. 14. This court agrees. A plaintiff has no money claim when alleging a violation of Due Process rights; only an opportunity to clear his name can be granted. *See Codd v. Velger*, 429 U.S. 624, 627, 97 S.Ct. 882, 883, 51 L.Ed.2d 92 (1977).

IT IS SO ORDERED.

No costs.